HOUSTON WELFARE RIGHTS ORGANIZATION, INC., et al., Plaintiffs-Appellants,

v.

Raymond W. VOWELL, etc., et al., Defendants-Appellees.

No. 75–2815.

United States Court of Appeals, Fifth Circuit.

July 13, 1977.

Rehearing Denied Aug. 22, 1977.

Jeffrey J. Skarda, Houston, Tex., John R. Williamson, Texas Rural Legal Aid, Harlingen, Tex., for plaintiffs-appellants.

John L. Hill, Atty. Gen., Frank C. Cooksey, Asst. Atty. Gen., Austin, Tex., for defendants-appellees.

Before GODBOLD, SIMPSON and GEE, Circuit Judges.

GEE, Circuit Judge:

This appeal requires us to consider whether the State of Texas, in the administration of its program of Aid to Families with Dependent Children (AFDC), complied with federal requirements.[1] The district

---

1. The nature of the plaintiffs' case requires an examination of the question of subject-matter jurisdiction. Unlike similar cases challenging state adherence to federal AFDC program requirements, plaintiffs do not challenge Texas' AFDC system on constitutional grounds that

court concluded that the Texas Department of Public Welfare's administration of the AFDC program did not violate federal law, see *Houston Welfare Rights Organization, Inc. v. Vowell,* 391 F.Supp. 223 (S.D.Tex. 1975). Plaintiffs appeal, arguing two major points: first, that Texas' policy of budgeting only a pro rata share of shelter and utility expenses when a non-AFDC recipient shares a recipient's residence violates federal regulations; and second, that Texas' use of an averaging process in changing from a system of individual budgeting employing ceilings on allowable need to a consolidated flat-grant system obscured the standard of need in violation of congressional requirements. We hold that the proration policy is invalid and remand to the district court for the entry of an order mandating a re-evaluation of the standards of need established under the new system.

### FACTS

■ Aid to Families with Dependent Children (AFDC) is a public assistance program established by the Social Security Act of 1935, as amended, 42 U.S.C. § 602 (1970). AFDC provides federal matching funds to states choosing to participate in order to aid the "needy child . . . who has been deprived of parental support or care by reason of the death, continued absence from home, or physical or mental incapacity of a parent, and who is living with" any of the several listed relatives. 42 U.S.C. § 606(a) (1970). States electing to receive such funds must employ them in programs which do not conflict with the Social Security Act. *Van Lare v. Hurley,* 421 U.S. 338, 340, 95 S.Ct. 1741, 44 L.Ed.2d 208 (1975); *Townsend v. Swank,* 404 U.S. 282, 92 S.Ct. 502, 30 L.Ed.2d 448 (1971).

Two aspects of federal administration of the AFDC program are of importance here. The first is a federal regulation, 45 C.F.R. § 233.90(a) (1976), that provides in part:

> In establishing financial eligibility and the amount of the assistance payment, only such net income as is actually available for current use on a regular basis will be considered, and the income only of the parent . . . will be considered available for children in the household in the absence of proof of actual contributions.

The second is a congressional requirement imposed on participating states by 42 U.S.C. § 602(a)(23) (1970),[2] which requires that states adjust the determination of needs of individuals to reflect changes in living costs up to July 1, 1969. In *Rosado v. Wyman,* 397 U.S. 397, 90 S.Ct. 1207, 25 L.Ed.2d 442 (1970), the Supreme Court noted two reasons for this requirement:

> First, to require States to face up realistically to the magnitude of the public assistance requirement and lay bare the extent to which their programs fall short of fulfilling actual need; second, to prod the States to apportion their payments on a more equitable basis.

397 U.S. at 412–13, 90 S.Ct. at 1218.

The State of Texas participates in the AFDC program and administers it through

provide federal jurisdiction to hear pendent claims of statutory violation. *See, e. g., Hagans v. Lavine,* 415 U.S. 528, 536–44, 94 S.Ct. 1372, 39 L.Ed.2d 577 (1974). Plaintiffs bring a statutory action only. Nevertheless, the district court properly concluded that it had jurisdiction under 28 U.S.C. § 1343(4), which provides federal jurisdiction "[t]o recover damages or to secure equitable or other relief under any Act of Congress providing for the protection of civil rights . . . ." In analogous contexts we have held that statutory rights concerning food and shelter are "rights of an essentially personal nature" and that plaintiffs may invoke 42 U.S.C. § 1983 to protect those rights. *See Gomez v. Florida State Employment Service,* 417 F.2d 569, 580 n. 39 (5th Cir. 1974). Although other circuits disagree, *see Andrews v. Maher,* 525 F.2d 113 (2d Cir. 1975); *Randall v.*

*Goldmark,* 495 F.2d 356 (1st Cir. 1974), we have held that § 1983 is an "Act of Congress providing for the protection of civil rights". sufficient to invoke § 1343(4) jurisdiction. *See Gomez, supra; Hall v. Garson,* 430 F.2d 430 (5th Cir. 1970).

2. (a) A State plan for aid and services to needy families with children must . . . . .
> (23) provide that by July 1, 1969, the amount used by the State to determine the needs of individuals will have been adjusted to reflect fully changes in living costs since such amounts were established, and any maximums that the State imposes on the amount of aid paid to families will have been proportionately adjusted . . . . .

the Texas Department of Public Welfare (DPW). Prior to March 1, 1973, Texas' AFDC program employed a combination of ceilings on allowable need and percentages of the allowable need to determine the level of benefits for recipients. The procedure is fully described in the district court's opinion, see 391 F.Supp. at 227–28. It suffices to say here that the DPW defined three categories of need (personal need allowance, shelter allowance and utilities allowance), with ceilings upon each category.[3] The sum of the amounts determined under each category calculated for the family unit was the "standard of need." The DPW determined the "level of benefits" by taking 75% of this standard of need. The payment to each recipient was further decreased by any income he received other than welfare benefits. On March 1, 1973, the DPW converted its program by consolidating the various categories and standards of need to one figure determined by the size and composition of the household.[4] The level of benefits is 75% of the consolidated figure. The DPW determined the consolidated figure by averaging past standards of need for households of various sizes and compositions receiving AFDC payments. Thus, the DPW changed from a system of individualized budgets to standardized budgets with an attendant increase in administrative efficiency.

Another aspect of the Texas system of AFDC expenditure applied consistently under both plans of determining AFDC expenditure is the DPW's policy of prorating recipients' shelter and utility expenses in calculating the standard of need when noneligible individuals live with a recipient.[5] The proration occurs whether or not the noneligible lodger actually contributes to the shelter and utility expenses of the household. The DPW justifies the policy as recognizing the economies of scale which result when several individuals live in one shelter and as avoiding state payment of a noneligible individual's shelter and utility expense. The proration policy has the effect of lowering the recipient's allowable need so as to lower, in turn, his level of benefits.

## PRORATION POLICY

 Plaintiffs challenge the Texas DPW's proration policy as violating 45 C.F.R. § 233.90(a) (1976) by presuming that the noneligible individual living with the recipient contributes toward the shelter and utility expenses, thus reducing the need of the recipient. The DPW responds that its policy does not presume *income* to the recipient, only reduction of the recipient's standard of need. The DPW merely presumes

3. For example, the shelter allowance for one or two persons in private housing was $33: if a recipient paid more, the ceiling was $33; if he paid less, the actual amount paid determined his need.

4. Texas accomplished this consolidation by averaging the amounts paid to the total universe of AFDC families of various sizes, in the caretaker and noncaretaker categories, for the months of November 1971, February 1972, May 1972 and August 1972. The DPW obtained the average of all families of certain size in each category for the items of personal needs, housing, utilities, glasses, dentures, hearing aids, professional care and social care.

5. 3122 *Utilities,* paragraph 5. "When a recipient shares living arrangements with non-dependent relatives, his budget will carry his prorata share and that of his dependents of the utility chart figure, provided the non-dependent relative does not meet this expense for him."
 3122.3 *Shelter,* paragraphs 4, 5 and 6. "When the applicant or recipient lives with

non-dependent relatives in their shelter, his prorata share(s) of the shelter expense [within the group maximum] shall be budgeted *provided* the non-dependent relative does not meet all this expense for him. This means that the applicant and/or recipient must actually be participating in meeting shelter expense before his prorata share(s) can be budgeted.
 "When non-dependent relatives live with the applicant in his shelter, the applicant's prorata share(s) of the shelter expenses [within the group maximum] shall be an allowable expense, providing the non-dependent relatives do not meet this expense for him.
 "Regardless of the economic situation of the non-dependent relative in either of the above situations, both shelter and utilities will be budgeted only in the amount of the prorata share of the applicant and his dependents."
Texas DPW, Financial Services Handbook, Revision No. 23.

that the nonrecipient will pay his own way. The nonrecipient's presumed contribution to cover his expenses combined with economies of scale realized by group living indicates that the recipient's standard of need is less. The district court accepted the state's argument, but a Supreme Court decision since the district court's determination, *Van Lare v. Hurley,* 421 U.S. 338, 95 S.Ct. 1741, 44 L.Ed.2d 208 (1975), mandates a different result.

In *Van Lare,* the Supreme Court considered the effect of a New York public welfare regulation similar to that of Texas:

> A non-legally responsible relative or unrelated person in the household . . shall be deemed to be a lodger or boarding lodger . . . . In the event a lodger does not contribute at least $15 per month, the family's shelter allowance including fuel for heating, shall be a pro rata share of the regular allowance.

18 N.Y.C.R.R. § 352.30(d). The Court found the regulations invalid "insofar as they are based on the assumption that the nonpaying lodger is contributing to the welfare household, without inquiry into whether he in fact does so." 421 U.S. at 346, 95 S.Ct. at 1747. *Van Lare* appears to control, but the state attempts to distinguish it on the ground that the invalidated New York statutory scheme specifically presumed that the income of a lodger was devoted to his pro-rata share of shelter costs.

The state's attempt to distinguish *Van Lare* fails. The relevant New York statute provided in pertinent part:

> 18 N.Y.C.R.R. § 352.31:
>
> (a) For applicant or recipient.
>
> \* \* \* \* \* \*
>
> (3) When a female applicant or recipient is living with a man to whom she is not married, other than on an occasional or transient basis, his available income and resources shall be applied in accordance with the following:
>
> \* \* \* \* \* \*
>
> (iv) When the man is unwilling to assume responsibility for the woman or her children, and there are no children of

which he is the acknowledged or adjudicated father, he shall be treated as a lodger in accordance with section 352.-30(d).

18 N.Y.C.R.R. § 352.30:

> 352.30 Persons included in the budget.
>
> \* \* \* \* \* \*
>
> (d) A non-legally responsible relative or unrelated person in the household, who is not applying for nor receiving public assistance shall not be included in the budget and shall be deemed to be a lodger or boarding lodger. The amount which the lodger or boarding lodger pays shall be verified and treated as income to the family. For the lodger, the amount in excess of $15 per month shall be considered as income; for such boarding lodgers, the amount in excess of $60 per month shall be considered as income. *In the event a lodger does not contribute at least $15 per month, the family's shelter allowance including fuel for heating, shall be a pro rata share of the regular shelter allowance.* (emphasis supplied)

The state argues that the language of § 352.31(a)(3) ("his available income and resources shall be applied in accordance with the following") and § 352.30(d) ("The amount which the lodger or boarding lodger pays shall be verified and treated as income to the family") reveal that the New York scheme for reducing the shelter allowance prorata involved a presumption of income to the welfare family, not a presumption of reduced need. We disagree with the state's characterization of the New York approach. Although the New York scheme generally speaks of income, the relevant section in which the prorata policy appears does not explicitly presume that the nonrecipient's income will be applied to shelter expense;[6] instead, the statute implies that an AFDC

---

**6.** In fact, the provisions mentioning income relied upon by the state refer only to the application of the income of a "man in the house." The provision struck down in *Van Lare* refers to all nonlegally responsible relatives or unre-

lated persons, including mothers, over-age children or sisters. These, too, qualified as lodgers with no provisions specifically mentioning that their status was a way of presuming that their income was available to the family.

family with a lodger has a reduced need for shelter so that the shelter allowance is reduced prorata. Further, in *Taylor v. Lavine,* 497 F.2d 1208 (2d Cir. 1974), the Second Circuit case later reversed in *Van Lare,* the Second Circuit upheld the New York scheme specifically on the ground urged here by Texas: that the statute merely provided a means of determining actual need and reflected the economies of scale realized in group living. 497 F.2d at 1215–16. Because we can find no meaningful distinction between the statutory scheme struck down in *Van Lare* and the Texas DPW's proration policy, we conclude that *Van Lare* controls, and the proration policy is improper.

Even had Texas successfully distinguished the New York statutory scheme from its proration policy, the DPW's policy still runs afoul of 45 C.F.R. § 233.90(a). The presumption that a recipient's shelter and utility expenses are lowered—creating less need—when a nonrecipient lives in the household implicitly presumes that the nonrecipient's income is available to offset his share of the shelter and utility costs. *See Hoehle v. Likins,* 405 F.Supp. 1167, 1174 (D.Minn.1975), *aff'd,* 538 F.2d 229 (8th Cir. 1976). If not, the recipient's "need," in terms of actual shelter cost, will not decrease. The DPW's claim that it is only reflecting the economies of scale enjoyed by large groups living together again implicitly presumes that the nonrecipient's income will be available to offset shelter and utilities. Without that presumption, the economies-of-scale argument is irrelevant. As examples, the total cost of shelter and utilities to the AFDC household has not changed; it remains in need of that amount. *See Taylor v. Lavine,* 497 F.2d 1208, 1222 (2d Cir. 1974) (Oakes, J., dissenting); Note, 88 HARV.L.REV. 654, 658–59 (1975). If the nonrecipient moves out, the household receives a full share even though its rent obligation has not increased. Clearly, as in *Van Lare,* "the nonpaying lodger's mere presence results in a decrease in benefits", 421 U.S. at 346, 95 S.Ct. at 1747, and

"the fact that the allowance varies with the lodger's presence demonstrates that it is keyed, as the regulations plainly imply, to the impermissible assumption that the lodger is contributing income to the family." 421 U.S. at 347, 95 S.Ct. at 1748. The state's argument that it should be allowed to avoid paying for a nonrecipient's shelter also is answered in *Van Lare:*

Another, somewhat related, justification asserted is that the shelter allowance is reduced to prevent lodgers, who by definition are ineligible for welfare, from receiving welfare benefits. The regulations, however, do not prohibit lodgers from living in welfare homes. The lodger may stay on after the allowance is reduced, and the State takes no further action. The only victim of the state regulations is thus the needy child who suffers reduced benefits. But States may not seek to accomplish policies aimed at lodgers by depriving needy children of benefits. *King v. Smith,* supra [392 U.S. 309] at 326, 88 S.Ct. 2128, at 2138, 20 L.Ed.2d 1118; *Lewis v. Martin* [397 U.S. 552, 90 S.Ct. 1282, 25 L.Ed.2d 561 (1970)] supra.

Thus, the DPW's proration policy, in presuming that a recipient's need decreases when a nonrecipient resides in the household, violates federal regulations controlling state administration of AFDC programs because his need of assistance does not decrease unless the nonrecipient is paying his own way.

This does not mean that the entire proration policy is invalid, however. When a recipient lives with nondependent relatives in their shelter, the DPW recognizes his need only to the extent of the recipient's prorata share of shelter and utility costs. This policy does attempt to assess the need of the recipient and does not unlawfully presume the availability of income to him. Both justifications of the proration policy as an assessment of need validly apply. Economies of scale are realized, as the recipient adds to the group living in the shelter and reduces the per capita shelter cost. Paying

to the recipient a prorata share of the flat grant for that size household properly prevents state payment of welfare benefits to noneligible individuals. This policy does not presume that income is available to the recipient because the recipient receives his prorata share *unless* the nondependent relative meets that expense for him. The nondependent relative is liable for the shelter or utility cost; the state's policy prevents relatives' attempts to profit by charging disproportionate rents to children in no position to protect themselves. *Johnson v. White,* 528 F.2d 1228, 1237 (2d Cir. 1975). In this situation, then, the DPW's proration policy is valid.

## CONSOLIDATION TO FLAT–GRANT SYSTEM

■ The plaintiffs also challenge the averaging process employed in Texas' change to a flat-grant AFDC system. In *Rosado v. Wyman,* 397 U.S. 397, 90 S.Ct. 1207, 25 L.Ed.2d 442 (1970), the Supreme Court recognized that a state may employ an averaging process to redefine its method for determining need as long as "all factors in the old equation are accounted for and fairly priced and providing the consolidation on a statistical basis reflects a fair averaging . . . ." 397 U.S. at 419, 90 S.Ct. at 1221. Our only concern in this process is preventing the state from obscuring the standard of need updated to June 1, 1969 levels as required by Congress in § 602(a)(23). Plaintiffs claim that Texas' consolidation obscured the standard of need.

Insofar as the Texas DPW's proration policy is invalid, the policy's existence at the time Texas computed the statistical averages that led to the flat grant inevitably skewed the averages downward. The proration policy, when applicable, always reduced the allowances for shelter and utilities, foreclosing the possibility of fairly pricing the standard of need for shelter and utilities. Although it is possible that a state policy that foreclosed fair pricing of one of the factors of the standard of need would have a *de minimis* effect, Texas implicitly concedes the substantial impact of its policy on the averaging. The state's brief remarks that our invalidation of the proration policy would necessitate a new averaging for the budgetary standard of need. As we have concluded that the DPW's proration policy did not comply with federal requirements, Texas must recalculate its budgetary standard of need for its flat-grant system.[7]

Since plaintiffs challenge other averaging procedures which Texas may wish to employ in its new determination, we consider these as well. Plaintiffs complain of two other aspects of DPW's consolidation to a flat-grant system: first, that the DPW averaged in amounts paid to AFDC households with actual shelter needs below the ceilings set by the DPW but averaged in AFDC households with actual shelter needs above the DPW ceilings at the ceiling amount; and second, the DPW averaged in AFDC households with no shelter expense at all. Plaintiffs argue that these procedures unduly obscured the standard of need required by Congress in § 602(a)(23).

To understand the plaintiff's objection to Texas' averaging process, one must understand the components of the averaging. Before converting to a flat-grant system, Texas employed ceilings in its shelter allowances under its standard of need. These ceilings reflected Texas' assessment, by means of original cost studies gradually updated, of minimum shelter needs, i. e., those necessary "to provide a reasonable subsistence compatible with decency and health." Tex.Rev.Civ.Stat.Ann. art. 695c, § 17(6) (Supp.1977). These ceilings were properly updated to reflect the cost of living at 1969 levels as required by Congress in 42 U.S.C. § 602(a)(23) (1970). *See Jefferson v. Hackney,* 406 U.S. 535, 543, 92 S.Ct. 1724, 32

---

7. We grant Texas a reasonable time to recalculate its budgetary standard of need. As an interim measure, Texas may employ the present budgetary standard of need figures without, of course, utilizing the proscribed proration policy. For example, Texas may wish to restrict its definition of "household" to include only AFDC recipients and a caretaker, if a caretaker is in the household.

L.Ed.2d 285 (1972) (Texas' 11% increase in ceilings complied with § 602(a)(23) requirements). Not all families were allowed the ceiling amounts because their actual shelter needs were less; those families were allowed only amounts equal to their actual shelter cost. This system allowed Texas to meet § 602(a)(23) requirements but to keep welfare costs down by allowing less than the ceilings to those who needed less—and so paying lower levels of benefits. When the state averaged its payments to AFDC recipients to determine the amount it should pay in a flat grant, the averaging included families which received only the ceiling amount for shelter and families which received their actual shelter expenses that were less than the ceiling amount. The inevitable result of this process was to produce an averaged figure lower than that of the original ceiling. Plaintiffs complain that this averaging procedure unduly obscured the standard of need.[8]

Whether Texas' averaging using shelter ceilings violated § 602(a)(23) presents a close and complex question. Resolution of that question requires that we first explore the criteria employed by the Supreme Court in evaluating averaging procedures and then examine the extent to which we may go behind the operation of statistical analysis to examine the result of the procedures. As we noted earlier, *Rosado* clearly authorizes averaging as a process leading to a flat-grant system as long as "all factors in the old equation are accounted for and fairly priced and providing the consolidation on a statistical basis reflects a fair averaging . . . ." 397 U.S. at 419, 90 S.Ct. at 1221. Definition of the Delphic terms "fair pricing" and "fair averaging" is a prerequisite to meaningful analysis.

■ That items included in the standard of need be "fairly priced" means only that a state may not artificially price an item so

low that the item is essentially eliminated from the standard of need. See *New Jersey Welfare Rights Organization v. Cahill,* 349 F.Supp. 501, 510 (D.N.J.1972), aff'd, 483 F.2d 723 (3d Cir. 1973). This definition follows from *Rosado's* proscription of a state's reducing the content of its standard of need. See 397 U.S. at 417, 90 S.Ct. 1207. Severe reduction of the price of an item would accomplish the same result as not even considering the item in the standard of need. This definition allows us to examine for violations of § 602(a)(23) egregious manipulations of the standard of need by price reduction, but forces us to recognize that a state—as long as it has complied with § 602(a)(23), as Texas has done—has considerable leeway in determining the proper price for items in its standard of need.

■ The definition of "fair averaging" has proved more elusive. In the context in which *Rosado* employed the term—"providing the consolidation on a statistical basis reflects a fair averaging," 397 U.S. at 419, 90 S.Ct. at 1221—it is clear that "fair averaging" at the very least requires technical statistical validity in the state's procedures. See *New Jersey Welfare Rights Organization v. Cahill, supra* at 510. For example, in *Johnson v. White,* 528 F.2d 1228 (2d Cir. 1975), the Second Circuit invalidated a portion of Connecticut's conversion to a flat-grant system when it found that Connecticut had employed a sample too small to produce a statistically meaningful average. 528 F.2d at 1238–40. Not only do we endorse this approach to the fair-averaging definition, but we also view "fair averaging" in a broader context not tied to the Supreme Court's use of those terms. Like the district court in *Roselli v. Affleck,* 373 F.Supp. 36 (D.R.I.), aff'd, 508 F.2d 1277 (1st Cir. 1974), we "must look at the end product of the averaging process to determine

8. Although plaintiffs also protest the inclusion of households with zero shelter expense in the averaging, we do not view this policy as a special case. Of course, insofar as the zero or extremely low shelter expenses derived from the proration policy, they unduly obscured the standard of need. In those cases where the

zero shelter need resulted from living in homes not mortgaged or rent-free, inclusion of those households in the averaging process was proper. This actual housing cost is zero and is just as relevant as that of the family with extremely low shelter expenses. The difference is only one of degree, not of kind.

whether the figures produced by the averaging are consistently and materially out of proportion with the relevant former definition of 'standard of need'." 373 F.Supp. at 44. Examining Texas' averaging approach, we find no violations of either of these criteria.

Texas fairly priced shelter needs when it included the amounts actually paid to welfare families during the relevant periods. It is true that those families who received the ceiling amounts might have had greater shelter needs than reflected in the ceiling amounts, but a state is entitled to some flexibility in assessing a fair price for shelter needs. These ceilings have already met the requirements of 42 U.S.C. § 602(a)(23). *See Jefferson v. Hackney, supra.* We cannot say that a price that meets § 602(a)(23)'s criteria is so artificially low that it is eliminated from the standard of need of those families included in the averaging.

Texas fairly averaged in its statistical analysis. Plaintiffs do not assert that Texas omitted any factor of the old standard of need equation in its calculations, unlike New York's omission of a "special grants" category in *Rosado.* Texas averaged the amounts actually paid to all AFDC households of various sizes and compositions on four separate occasions in 1972. *See* n. 4, *supra.* The technical basis for the DPW's statistical analysis—the size of the sample, the timing of the samples, etc.—appears unassailable. To some extent the DPW's use of ceilings in the averaging process produced figures less than the maximum standard of need recognized by the DPW, but the reduction was not significant. After the institution of the new system, Texas paid out almost exactly the same amount of money as under the old system. Texas' averaging process produced no broad distortion in the former standard of need that would lead to condemnation under § 602(a)(23).

### RETROACTIVE RECOVERY

Plaintiffs also seek recovery of retroactive AFDC benefits. Their claims are foreclosed by the eleventh amendment. *See Edelman v. Jordan,* 415 U.S. 651, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974). Plaintiffs argue that the Children's Assistance Fund and the Disabled Assistance Fund created by Tex.Rev.Civ.Stat.Ann. art. 695c, § 27(1) (1976 Supp.) are funds separate from the state treasury so that *Edelman* does not apply. They rely on *Bowen v. Hackett,* 387 F.Supp. 1212 (D.R.I.1975), which held that the eleventh amendment did not bar a recovery against a state unemployment fund financed solely by employers' contributions. In our case, however, the separate funds created for public welfare programs are only a matter of bookkeeping convenience: they are still funded by the state so that any award would resemble too closely a money judgment against the state itself. *See Edelman, supra* at 665, 94 S.Ct. 1347. Plaintiffs are entitled to no damage recovery.

### CONCLUSION

A major part of the DPW's proration policy violates 45 C.F.R. § 233.90(a). The violation infected the averaging process so as to require a new evaluation of the proper standard of need. In making this reevaluation, Texas is free to use the averaging procedure first employed as long as it purges that procedure of the proration taint. During a reasonable period for recalculating the chart figures, Texas may employ the flat-grant figures in present charts without, of course, employing the proscribed aspects of the proration policy.

REVERSED.