Therese ROBERGE, on behalf of herself, her minor children and all persons similarly situated, Plaintiffs-Appellants,

v.

Paul PHILBROOK, Commissioner of Social Welfare, Defendant-Appellee.

Nos. 852, 1023, Dockets 74–2167, 74–2225.

United States Court of Appeals, Second Circuit

Argued April 8, 1975.

Decided June 17, 1975.

John A. Dooley, III, Burlington, Vt. (Vt. Legal Aid, Inc., of counsel), for plaintiffs-appellants.

David L. Kalib, Montpelier, Vt., for defendant-appellee.

Before HAYS, GURFEIN and VAN GRAAFEILAND, *Circuit Judges.*

VAN GRAAFEILAND, *Circuit Judge:*

■ This class action, which challenges portions of Vermont's Aid to Needy Families with Children (ANFC) program, originally presented constitutional arguments requiring the convening of a three-judge court. However, it was agreed by stipulation that the action might be heard by a single judge on plaintiff's claim that certain actions of the defendant violated Subchapter IV of the Social Security Law, 42 U.S.C. § 601 et seq., and regulations promulgated thereunder.[1]

Subsequent to such stipulation, cross motions for summary judgment were argued before Judge Oakes, sitting by designation as a District Judge. Judge Oakes held that only one of the issues before him was determinable by summary judgment. That involved a difference between the maximum payments allowed as reimbursement for the cost of shelter in Chittenden County and the remainder of the State.

Figures submitted to Judge Oakes showed that the cost of shelter in Chittenden County, in which the City of Burlington is located, was substantially higher than elsewhere in the State and that an adjustment had been made in the allowance for shelter needs under ANFC to reflect this difference. However, the difference in shelter allowances was proportionately less than the difference in rent. This, plaintiff claimed, was improper, relying primarily on the decision of this Court in *Boddie* v. *Wyman*, 434 F.2d 1207 (1970).

In *Boddie* we affirmed an order of Judge Foley which enjoined the Department of Social Services of the State of New York from making lower monthly grants to upstate New Yorkers under New York's AFDC and AABD programs[2] until such time as the Department presented evidence that costs were higher in New York City than elsewhere in the State. Recognizing the statutory and regulatory aim of uniform statewide standards, we held that a departure from uniformity must be justified by objectively established cost differentials.

■ That requirement has been met in the instant case. Although, concededly, cost differentials in Vermont might have warranted a greater disparity between the shelter allowances for Chittenden County and the remainder of the State, it does not follow that the State's decision to differentiate in shelter allowances to the extent that it did was arbitrary or not within the State's discretion.[3]

That, in essence, was Judge Oakes' holding, and we agree. His grant of defendant's motion for summary judg-

---

1. Since Vermont receives Federal funds for its ANFC program, it must disburse them in accordance with Federal requirements. *King* v. *Smith*, 392 U.S. 309, 88 S.Ct. 2128, 20 L.Ed.2d 1118 (1968).

2. Aid to Families with Dependent Children and Aid to the Aged, Blind or Disabled.

3. It should also be noted that the *Boddie* action was brought by disfavored recipients while here the appellant has derived benefit from the differential.

ment as to this portion of plaintiff's claim was therefore proper.

Following Judge Oakes' ruling on the summary judgment motion, two issues remained for resolution at trial, one involving so-called "shelter exceptions" and the other dealing with payments for fire insurance. To understand these issues, a general knowledge of the Vermont ANFC program is required.

Payments under Vermont's program are based upon a standard of need, the components of which have been modified somewhat from time to time. Prior to November 1, 1970, it consisted of three elements:

1. Basic needs—food, clothing, fuel, etc., but excluding the cost of shelter.

2. Shelter allowance—the cost of shelter with prescribed maximums.

3. Special needs—telephone, home repairs, fire insurance, etc.

In cases where rental paid exceeded the shelter allowance maximums, the Department of Social Welfare sometimes made payments in excess of the prescribed maximums by use of what it called "shelter exceptions".

§ 402(a)(23) of the Social Security Law, 42 U.S.C. § 602(a)(23), enacted in 1967, provided "that by July 1, 1969, the amounts used by the State to determine the needs of individuals will have been adjusted to reflect fully changes in living costs since such amounts were established, and any maximums that the State imposes on the amount of aid paid to families will have been proportionately adjusted".

In November 1970, a change was made in the Vermont regulations which, while continuing the use of shelter maximums, eliminated the practice of granting shelter exceptions.

■ It is plaintiff-appellant's contention that the elimination of shelter exceptions violated § 402(a)(23). Appellant argues that the shelter exceptions were really part of the shelter maximums and that, pursuant to § 402(a)(23), so long as the shelter maximums continued in existence, the shelter exceptions must be updated absolutely and without ratable deduction. As interpreted by the courts, this section does, indeed, require an absolute adjustment of maximums to comply with increased living costs. *Rosado* v. *Wyman*, 397 U.S. 397, 413, 90 S.Ct. 1207, 25 L.Ed.2d 442 (1970); *Alvarado* v. *Schmidt*, 317 F.Supp. 1027, 1036 (W.D. Wis.1970); *Utah Welfare Rights Organization* v. *Lindsay*, 317 F.Supp. 294 (D.Utah 1970).

■ Unfortunately, the facts were not developed on the trial with the thoroughness we would have liked, and we do not have the benefit of the thinking of H.E.W. on any of the matters at issue herein.[4] However, on the record before us, we have concluded that shelter exceptions were not part of the shelter maximums.

The word "maximum" implies limitation. There was no ceiling placed upon shelter exceptions. Indeed, the very purpose of the exceptions was to avoid the limiting effects of the prescribed maximums. In that portion of appellee's Family Services Policy Manual dealing with shelter maximums, shelter exceptions are appropriately entitled "Exceptions to the above maximums". We would find it somewhat illogical to conclude that an exception to a maximum is in actuality part of the maximum.

We are also persuaded to this view by the fact that there were no statewide guidelines or criteria for granting shelter exceptions and by the failure of the State to consider that portion of rent which would be covered by a shelter exception in determining initial eligibility under the ANFC program.

4. To illustrate the problems which arise from an unsatisfactory record, appellee contends in his brief that when shelter exceptions were eliminated, the cost of such exceptions was spread throughout the entire ANFC caseload. However, no evidence was introduced to show that such averaging took place, and there is testimony to indicate that it did not.

It is undisputed that shelter exceptions were not included in the basic needs or special needs categories of the Vermont program. Since they did not fit into any of the three stated categories, i. e., basic needs, shelter maximums or special needs, the question arises as to whether shelter exceptions were part of the standard of need in Vermont's ANFC program at the time they were eliminated.

H.E.W. regulations require that a state plan specify a statewide standard, expressed in money amounts, to be used in determining the need of applicants and recipients and the amount of the assistance payment. 45 C.F.R. § 233.-20(a)(2)(i) (1974). Such regulations also provide that the standard be uniformly applied throughout the State. 45 C.F.R. § 233.20(a)(2)(iii) (1974).

In *Rosado, supra*, at 408, 90 S.Ct. 1207, the Court defined standard of need as a "yardstick for measuring who is eligible for public assistance" and stated that each State has a great deal of discretion in determining what is included in this "yardstick". If Vermont's ANFC officials, in the exercise of this discretion, included shelter exceptions as part of that State's standard of need, one would expect they would so testify. Yet, the officials who were called as witnesses testified that shelter exceptions were not considered part of the standard of need.

The fact that shelter exceptions were not uniformly granted on the basis of statewide criteria, as required by H.E.W. regulations, and were not used in determining eligibility, as required by the same regulations, supports this testimony. On the basis of the proof presently before us, we see no reason for holding that Vermont's exercise of discretion was different from what these officials said it was.

Accordingly, if we were writing on a clean slate, we might well hold that shelter exceptions did not constitute part of the standard of need in Vermont's ANFC program. However, the District Court approached the matter somewhat differently by holding that shelter ex-ceptions were part of the standard of need, but an insignificant part. Judge Oakes, who heard the motion for summary judgment, felt, on the basis of the affidavits submitted to him, that shelter exceptions were a part of the shelter allowance and that therefore they could not be deleted unless they were a totally insignificant part of the overall ANFC program. In *Rosado, supra*, the Supreme Court held that a state may not significantly reduce the content of its standard of need by eliminating what are considered regular recurring expenses to a significant number of welfare recipients.

Judge Coffrin felt constrained to determine the issue as it had been framed by Judge Oakes; viz., were shelter exceptions a significant part of the ANFC program? He decided that they were not. He based this conclusion on findings that payments under the shelter exceptions practice constituted less than one-half of one percent of the total amount spent on the ANFC program and that, prior to November 1970, only 4.2% of the total statewide caseload received shelter exceptions. Judge Coffrin also found that only 5% of the statewide caseload receiving shelter grants also received shelter exceptions and that only 1½% of the total amount spent for shelter was allocated to shelter exceptions. Judge Coffrin concluded that the shelter exception practice was not a significant part of Vermont's ANFC program and accordingly ordered judgment for defendant on this point.

Since neither party challenges the accuracy of the District Court's findings and since they are not clearly erroneous, we accept them. We also approve the District Court's holding based thereon.

Thus, whether it is held that shelter exceptions were not part of Vermont's ANFC standard of need or were an insignificant part of such standard, we conclude that appellee should not be enjoined from eliminating them from its program.

 Vermont's handling of its special need for fire insurance requires a contrary result. Prior to November 1, 1970, ANFC recipients were entitled to purchase fire insurance and obtain reimbursement therefor as a "special need". There was no ceiling or maximum on the amount of such reimbursement.

Fire insurance was among the special needs eliminated from the Vermont ANFC program in 1970. While the cost of other special needs eliminated at that time was averaged into the category of basic needs, fire insurance was specifically placed in the shelter allowances category.[5] As already pointed out, Vermont's allowances for shelter carried prescribed maximums, and pursuant to § 402(a)(23) such maximums could not be reduced.

 When a State includes additional items within an allowance covered by a maximum, it reduces that maximum as effectively as if it had lowered the dollar ceiling. If a recipient's existing rental plus his fire insurance consume the entire amount of his shelter allowance maximum, there will be no funds available for payment of an increase in rental as there would have been had fire insurance not been included. In effect, then, his maximum allowance for rental has been reduced by the addition of fire insurance to his shelter allowance.

Moreover, by placing fire insurance within the shelter allowance, the State made it subject to a maximum where none was applicable before. The State concedes in its brief that fire insurance, previously provided as a special need, was deleted from the ANFC budget of all shelter recipients whose shelter grant was at the maximum. If not completely eliminated, it might well be reduced. The trial court therefore correctly concluded that, by removing fire insurance from the special needs category, where, prior to November 1, 1970, no limit had

been placed on this item, and placing it under the shelter maximums, the State accomplished just the reverse of what is required by § 402(a)(23). *Alvarado* v. *Schmidt, supra,* at 1036.

For the foregoing reasons, the order of Judge Oakes and the order of judgment of Judge Coffrin are affirmed.

---

**5.** There was testimony that, after its elimination as a special need, fire insurance was treated as both a basic need and a shelter allowance. If so, this was an improper duplication.

*Rosado* v. *Wyman,* 322 F.Supp. 1173, 1186 (S.D.N.Y.1970), *aff'd,* 437 F.2d 619 (2d Cir. 1970).