**ILLINOIS WELFARE RIGHTS ORGANIZATION, an Ill. unincorporated association, the Chicago Welfare Rights Organization, an Ill. not-for-profit corporation, Rosie Newsome, Effie Black, on behalf of themselves and their minor children, and on behalf of all others similarly situated, Plaintiffs,**

v.

**James L. TRAINOR, Director, Illinois Department of Public Aid, and the Illinois Department of Public Aid, a governmental agency, Defendants.**

No. 73 C 2437.

United States District Court,
N. D. Illinois, E. D.

Sept. 29, 1977.

Kenneth K. Howell, Robert E. Lehrer, James D. Weill, Legal Assistance Foundation of Chicago, Chicago, Ill., for plaintiffs.

William J. Scott, Atty. Gen., State of Illinois, Thomas P. Sullivan, Theodore R. Tetzlaff, Gregory G. Wille, Jenner & Block, Chicago, Ill., for defendants.

## MEMORANDUM OPINION

FLAUM, District Judge:

This action involves important issues concerning the operation of the Illinois Aid to Families with Dependent Children (AFDC) public assistance program. Plaintiffs, including several individuals and several welfare rights organizations, are challenging the manner by which the Illinois Department of Public Aid (IDPA) changed the method for determining eligibility and payment levels for AFDC benefits from a complex and individualized system to a simpler, consolidated flat-grant procedure.

Plaintiffs' complaint is divided into two counts. Count I alleges that the IDPA violated Title IV of the Social Security Act of 1935, *as amended,* 42 U.S.C. §§ 601 *et seq.,* when it instituted its Consolidated Standard Plan (CSP) in October, 1973. In particular, plaintiffs contend that section 402(a)(23) of the Act, 42 U.S.C. § 602(a)(23), was violated because the "standard of need" for AFDC recipients which existed under the prior, individualized system was unlawfully "obscured" in several respects by the creation of the CSP. Count II alleges that the 1973 CSP violated the equal protection clause of the fourteenth amendment to the United States Constitution. The complaint seeks declaratory and injunctive relief.

Presently before the court are the parties' renewed crossmotions for summary judgment on the issue of liability on Count I of plaintiffs' complaint.[1] However, before this court addresses plaintiffs' various challenges to defendants' actions, and defendants' responses thereto, the court must set forth the basic legal structure of the federal AFDC program, as well as the history and present nature of the Illinois AFDC scheme.

## I. The Aid to Families with Dependent Children Program

As the Supreme Court stated in *King v. Smith,* 392 U.S. 309, 88 S.Ct. 2128, 20 L.Ed.2d 1118 (1968):

> The AFDC program is based on a scheme of cooperative federalism. . . It is financed largely by the Federal Government, on a matching funds basis, and is administered by the States. States are not required to participate in the program, but those which desire to take advantage of the substantial federal funds available for distribution to needy children are required to submit an AFDC plan for the approval of the Secretary of Health, Education, and Welfare . . . The plan must conform with several re-

---

1. A brief note on the procedural history of this case is in order. Shortly after this suit was instituted a three-judge court was convened since the complaint in Count II raised various constitutional issues. The three-judge court, however, upon joint motion by the parties, remanded the case to the presiding single district judge in order to decide the fully briefed motions for summary judgment on the statutory issues raised in Count I. In an order dated January 14, 1977, this court denied the parties' motions for summary judgment finding that there were genuine issues of material fact concerning several issues involved in the action. The parties thereupon requested the court to reconsider its ruling and oral argument was had on the presently pending motions. This opinion, therefore, is the result of this court's reconsideration of the parties' motions.

quirements of the Social Security Act and with rules and regulations promulgated by H.E.W. *Id.* at 316–17, 88 S.Ct. at 2133. The purpose of the AFDC program is to provide cash payments and social services to "needy dependent children and the parents or relatives with whom they are living . . . ." 42 U.S.C. § 601.

■ In the leading case of *Rosado v. Wyman,* 397 U.S. 397, 90 S.Ct. 1207, 25 L.Ed.2d 442 (1970), the Supreme Court delineated the manner in which a state is to determine the amount of cash payments to an eligible AFDC recipient.

There are two basic factors that enter into the determination of what AFDC benefits will be paid. First, it is necessary to establish a "standard of need," a yardstick for measuring who is eligible for public assistance. Second, it must be decided how much assistance will be given, that is, what "level of benefits" will be paid.

*Id.* at 408, 90 S.Ct. at 1216. The "standard of need" referred to above consists of "the minimum subsistence level . . . determined by computing the cost of items considered necessary for subsistence." *Alvarado v. Schmidt,* 317 F.Supp. 1027, 1032 (W.D.Wis.1970). The states have been granted broad discretion in both the determination of the items which constitute the standard of need as well as the percentage of the standard of need which will actually be paid. *Rosado v. Wyman, supra,* 397 U.S. at 408, 90 S.Ct. 1207. Thus, in northern states, an individual state might include a winter coat in its computation of what is necessary for "minimal substance," while a southern state might exclude such an item. Moreover, while some states, *such as Illinois,* claim to pay *100 percent* of its standard of need to eligible AFDC recipients, other states pay varying fractions of the standard of need they establish. Accordingly, it is entirely proper under the federal AFDC program to have 50 different standards of need as well as 50 different actual payment levels in relation to each standard of need.

Although the states have a wide berth in administering their respective AFDC programs, as stated above there are several important limitations placed upon them by the Social Security Act. For purposes of the present action, the key provision is section 402(a)(23), which provides:

[The States shall] provide that by July 1, 1969, the amounts used by the States to determine the needs of individuals will have been adjusted to reflect fully changes in living costs since such amounts were established, and any maximums that the State imposes on the amount of aid paid to families will have been proportionately adjusted.

42 U.S.C. § 602(a)(23).

■ In *Rosado v. Wyman, supra,* the Supreme Court interpreted the mandate of section 402(a)(23). After recognizing that Congress provided little legislative history to aid the Court in construing the statute, 397 U.S. at 412, 90 S.Ct. 1207, the Court delineated what it determined the purposes of the statute to be:

We think two broad purposes may be ascribed to § 402(a)(23): First, to require States to face up realistically to the magnitude of the public assistance requirement and lay bare the extent to which their programs fall short of fulfilling actual need; second, to prod the States to apportion their payments on a more equitable basis. Consistent with this interpretation of § 402(a)(23), a State may, after recomputing its standard of need, pare down payments to accommodate budgetary realities by reducing the percent of benefits paid or switching to a percent reduction system, but it may not obscure the *actual* standard of need.

*Id.* at 412–13, 90 S.Ct. at 1218. Thus, in interpreting section 402(a)(23), the Supreme Court held that the "standard of need" established by a state for its AFDC program could not be altered or reduced even though the states had the power to vary their payment levels as they saw fit. In effect, what section 402(a)(23) mandated was "honesty" on the part of the administrators of state AFDC programs requiring them to inform

the public to what extent the state was failing to meet the subsistence needs of its citizens in relation to the standard of need established by the state itself. *See Roselli v. Affleck*, 508 F.2d 1277, 1279 (1st Cir. 1974). As the Court stated:

> Section 402(a)(23) invalidates any state program that substantially alters the standard of need in such a way that it is less than it was prior to the enactment of § 402(a)(23), unless a State can demonstrate that the items formerly included no longer constitute part of the reality of existence for the majority of welfare recipients. . . . Providing all factors in the old equation are accounted for and fairly priced and providing the consolidation on a statistical basis reflects a fair averaging, a State may, of course, consistently with § 402(a)(23) redefine its method for determining need.

397 U.S. at 419, 90 S.Ct. at 1221. Accordingly, in analyzing whether the strictures of section 402(a)(23) have been violated the courts must compare the standard of need before and after any change in a state's AFDC program.

## II. The Illinois AFDC Program

### A. Pre-1973

Under the IDPA's procedures prior to 1973, an individual AFDC recipient family's total "budgeted need" (the amount the family received) was computed by determining which of a large number of "needs" should be ascribed to the family and by totaling the dollar figures the IDPA paid for each of such needs. A large majority of AFDC families had computed, as part of their total budgeted need, certain items designated "basic needs" including food, clothing, shelter, etc. There were also "special needs," items which some families needed under specific circumstances as defined by IDPA. Among the "special needs" were items such as moving expenses, transportation expenses, special diets, etc.

Each basic and special need offered by IDPA fell into one of three categories as to the manner in which it was budgeted. First, "standard allowance" needs were uniform amounts for all similarly situated families, regardless of the actual cost of the item to the family. These "standard allowances" included clothing, food, household supplies and personal essentials. For example, food for an adult in a family of two was budgeted at $29.75 regardless of the actual price of food paid by the adult. Second, "paid as incurred" needs were defined as budgeted and paid on an "actual cost" basis, subject to a reasonableness standard. Such items included transportation expenses. And third, "maximum" allowance needs were defined as budgeted and paid as incurred up to a fixed maximum. An example of a "maximum" allowance was IDPA's budgeting of and payment of rent.

The sum of the "basic" and "special" needs for which the AFDC unit was determined eligible by IDPA constituted the family's "budgeted need."[2] If the family

---

2. For example, for a family consisting of a diabetic mother and a ten-year old child, living alone, during the winter, paying $110 for rent and needing a new bed, the budgeted need would be:

| | |
|---|---|
| Food, Adult, Family of 2 | $ 29.75 |
| Food, Child 6–12, Family of 2 | 26.89 |
| Clothing, Adult, Family of 2 | 7.50 |
| Clothing, Child 6–12, Family of 2 | 7.26 |
| Household Supplies, Adult, Family of 2 | 1.60 |
| Household Supplies, Child 6–12, Family of 2 | 1.60 |
| Personal Essentials, Adult, Family of 2 | 5.86 |
| Personal Essentials, Child 6–12, Family of 2 | 2.82 |
| Rent (Paid as incurred up to maximum) | 97.00 |
| Electricity (Chicago Zone)—Family of 2 | 4.55 |
| Cooking Fuel (Chicago Zone)—Family of 2 | 2.75 |
| Heating Fuel (Chicago Zone)—Family of 2 (Winter months) | 15.50 |
| Therapeutic Diet, Diabetic Adult | 6.22 |
| Bed Frame (used) | 15.00 |
| Bed Spring (used)—1 month only special need | 12.00 |
| Bed Mattress (new) | 19.95 |
| Total Budgeted Need | $256.25 |

had nonexempt unearned or earned income available to it, the nonexempt income would be deducted from such "budgeted need" to determine the family's payment amount. If the family had no nonexempt income or other deductions, the payment amount equaled the budgeted need.

### B. Post-1973

In October, 1973, IDPA decided to alter its method of computing the budgeted need for a family and instituted the Consolidated Standard Plan, or flat-grant program. In essence, this program involved the "averaging," over the entire AFDC caseload, of each item of need. Thus, if 10 percent of the AFDC recipients had been receiving a special telephone need of $5.00, and it was determined to eliminate that special need but to incorporate the special need item into a consolidated flat grant, the consolidation would result in a $.50 allotment to 100 percent of all AFDC recipients regardless of whether they obtained a telephone. Accordingly, by averaging each item of need over the entire caseload a fixed, flat-grant payment would be made on a recurring basis to each AFDC recipient and the need for complex, individualized determinations would be eliminated.

In summary, the IDPA consolidation methodology was as follows: First, IDPA determined how much it was actually paying recipients, by family size, in 1971. This was done by cumulating for each item of budgeted need the amount IDPA budgeted during calendar year 1971 for each family size, by "adult" and "nonadult" households.[3] The result was a set of dollar figures, by type of item, by family size and by type of family (i. e., adult) for 1971. For instance, in 1971, IDPA spent $27,673,114 for food for adult families of four. By dividing this figure by the number of "case-months" for adult families of four during the year, IDPA arrived at an average monthly figure for the budgeted need for that particular size and type of family during 1971.

Next, IDPA made a cost-of-living adjustment. IDPA adjusted all items to a July 1, 1969 price base. For example, during 1970 IDPA had granted a cost-of-living increase for food. Thus, in adjusting the food item IDPA adjusted downward to equalize it to a July 1, 1969 figure. However, for the clothing need item, since that figure had not been adjusted for inflation in recent years it was adjusted upward to 1969 levels.

By then adding the amount of each item for each size and type of family, IDPA had a statewide consolidated average budgeted need for 1971, adjusted to 1969 prices, for all items except shelter. IDPA then repeated the above steps for shelter but refined the data by county so that the consolidated level for shelter in 1971, adjusted to 1969 prices, were by family size, family type, and by three shelter zones.

Thus, the consolidated average monthly budgeted need for 1971, adjusted to 1969 prices for an adult family of four was:

|  | Group I Counties | Group II Counties | Group III Counties |
|---|---|---|---|
| Total, Nonshelter Codes | $153.98 | $153.98 | $153.98 |
| Total, Shelter Codes | 105.40 | 91.99 | 64.86 |
| Total | $259.38 | $245.97 | $218.84 |

The above figures were then compared to the "current payout level" which IDPA defined as the first quarter of 1973. Since the 1973 figures were 5.83 percent higher than the 1971 adjusted to 1969 figures, IDPA increased the 1971 figures 5.83 percent. Then, as a last step, IDPA added 6% to each figure, on the average.

The result of all these computations was the Consolidated Standard Plan (CSP) of October, 1973 with each average payment varying by family size, shelter zone, and type of family. Those families whose prior budgeted need was above the new flat level had their grants reduced; those families whose prior payments were lower had their grants increased.

---

**3.** An "adult" household is one where the adult head of the household is also obtaining AFDC benefits. A "nonadult" household is one where the head of the household is not an AFDC recipient.

As stated previously, plaintiffs are arguing that the *manner* by which IDPA established its CSP in 1973 improperly obscured the standard of need for AFDC recipients under the individualized grant system. Thus, plaintiffs do not challenge the *fact* of consolidation, which in light of *Rosado v. Wyman, supra,* would be futile. Basically, plaintiffs make six challenges[4] to the 1973 consolidation which this court shall consider seriatum.

### III. Plaintiffs' Challenges

#### A.

Plaintiffs' first argument concerns the manner in which the IDPA incorporated shelter costs into the 1973 CSP. Plaintiffs argue that the IDPA incorrectly included in its CSP the amount that *it had paid* to AFDC recipients and that instead the IDPA should have included the *amount paid by the AFDC recipients* for their actual shelter. Thus, plaintiffs argue that the "standard of need" in Illinois prior to the CSP was the actual amount paid by recipients for their shelter, and that prior to the consolidation Illinois was not paying the actual costs to recipients but rather the actual cost of recipients *up to* an illegal shelter maximum of $97, plus minor exceptions. Accordingly, since the preconsolidation figures for shelter did not include the massive "rent gap" that undisputably[5] existed between the amount of benefits paid for shelter to AFDC recipients and the actual amount paid for shelter by the AFDC recipients, the consolidation illegally incorporated improper figures and continued to mask an obscuring of the standard of need prior to 1973.

■ While this court agrees with plaintiffs that the interpretation of section 402(a)(23) of the Social Security Act of 1935, *as amended,* 42 U.S.C. § 602(a)(23), by the Court in *Rosado* prevents a state from obscuring a standard of need by perpetuating a prior illegality in the operation of

an AFDC program by way of a consolidation, *see Johnson v. White,* 528 F.2d 1228, 1237 (2d Cir. 1975), this court cannot agree with plaintiffs that based on the undisputed facts in this case, the defendants have improperly incorporated the prior shelter item standard into the CSP.

■ This conclusion by the court is based on the fact that the major premise of plaintiffs' argument, that the "standard of need" in Illinois prior to consolidation was what the family "needed," *i. e.,* what the family actually *paid* for shelter, is incorrect. This court is of the opinion, based on the undisputed facts, that the preconsolidated "standard of need" in Illinois for shelter was equal to that amount of shelter which would "provide a livelihood compatible with health and well-being for persons eligible for financial aid . . . ," Ill.Rev.Stat. ch. 23, § 12–4.11, and was "priced" at what an AFDC family paid for rent up to the shelter maximum of $97, plus any exceptions. Accordingly, decisions like *Roselli v. Affleck,* 373 F.Supp. 36 (D.R.I.1974), *aff'd,* 508 F.2d 1277 (1st Cir. 1974), are inapposite since those cases involved states which had set their preconsolidation standard for shelter at *actual cost* to recipients and the inclusion in the consolidation of the amount budgeted for shelter clearly altered and obscured the standard of need in violation of *Rosado's* mandate.

In support of their contention that the standard of need for shelter in Illinois prior to the CSP in 1973 was actual cost of shelter to AFDC recipients even if such costs were above $97, plaintiffs rely on the proposition that the "exceptions" to the $97 shelter maximum as provided for in Ill.Rev. Stat. ch. 23, § 12–14 were *required* to be granted as a matter of right to all recipients of AFDC who paid more than the shelter maximum for rent. This proposition is said to be supported by the three-judge panel decision in *Metcalf v. Swank,*

---

**4.** A seventh challenge to the CSP has been dropped for purposes of the plaintiffs' present motion for summary judgment.

**5.** Defendants have stipulated to the fact that there was a gap between the amount IDPA

paid recipients for shelter under the pre-1973 AFDC program and the amount the recipients paid for their shelter.

293 F.Supp. 268 (N.D.Ill.1968), which interpreted section 12–14.[6] In *Metcalf*, a three-judge panel was convened to consider a facial constitutional challenge to the Illinois shelter maximum provision. The three-judge court decided to dismiss the constitutional challenge and remand the case to a single-judge court.[7] The three-judge panel remanded the case on the ground that the exceptions to shelter maximums were *required* under Illinois law in order to assure "a livelihood compatible with health and well-being for persons eligible for financial aid," *id.* at 270; *see also Metcalf v. Swank*, 444 F.2d 1353, 1357 (7th Cir. 1971), *vacated and remanded on other grounds*, 406 U.S. 914, 92 S.Ct. 1778, 32 L.Ed.2d 1113 (1972), thereby avoiding the constitutional question of whether such exceptions could be arbitrarily denied.

However, it is clear that the *Metcalf* decision does not support plaintiffs' contention. *Metcalf* did not decide that IDPA was required to pay to AFDC recipients the *actual cost* of their shelter above the maximum, but only that through the use of the shelter maximum and exceptions provided by Ill. Rev.Stat. ch. 23, § 12–14, the IDPA was to provide sufficient shelter to AFDC recipients to assure "a livelihood compatible with health and well-being . . . ." In the case at bar, it is not defendants who have confused the "standard of need" with "budgeted need," but rather it is plaintiffs who have confused the "standard of need," which the states have a broad discretion in determining and *pricing*, with what plaintiffs call "actual need" but which is really "actual cost." The mere fact that AFDC recipients were paying more for shelter than the amount they received from IDPA does not show that IDPA was not providing sufficient funds to assure "a livelihood compatible with health and well-being." Thus,

even under *Metcalf*, plaintiffs could not argue that an AFDC recipient paying $200 for an apartment was entitled to a rent exception allowing the entire $200 of rent as the shelter allowance when adequate housing was available for $97 in the recipient's area.

It should be noted that this decision is supported by two recently decided cases. In *Houston Welfare Rights Organization, Inc. v. Vowell*, 391 F.Supp. 223 (S.D.Tex. 1975), *aff'd on this point*, 555 F.2d 1219, 1225–27 (5th Cir. 1977), the court held, in a case directly on point with the case at bar, that a shelter maximum could be incorporated into a consolidation flat-grant program without running afoul of *Rosado* and section 402(a)(23), even though the AFDC recipients were paying more for shelter than they were budgeted for. Thus the court said:

> Section 602(a)(23), as interpreted in *Rosado*, does not require that a state's standard of need be consistent with the amount the recipients actually pay to live
>
> . . . . .

*Id.* at 230. And, in *Roberge v. Philbrook*, 518 F.2d 162 (2d Cir. 1975), the Second Circuit recognized that a shelter maximum could be the *pricing* mechanism for the shelter standard of need.

In essence, plaintiffs' real argument concerning the "rent gap" which existed prior to the CSP is premised on the notion that the $97 maximum that existed prior to 1973 was too low to support the AFDC recipients and the shelter "standard" was unfairly priced. However, as stated previously and as reiterated several times in *Rosado*, states are given great latitude in *pricing* the items that constitute their standards of need. Unless such an item has been so lowly priced so as to essentially

---

**6.** It is important to note that the *Metcalf* litigation is still being litigated and crossmotions for summary judgment are presently pending relating to the proper operation of the preconsolidation shelter maximum exceptions. *Metcalf v. Swank*, 293 F.Supp. 268 (N.D.Ill.1968).

**7.** The single-judge court thereupon dismissed the entire action for failure to exhaust state

remedies and this dismissal was affirmed on appeal. *Metcalf v. Swank*, 444 F.2d 1353 (7th Cir. 1971). However, the dismissal was vacated by the Supreme Court, *Metcalf v. Swank*, 406 U.S. 914, 92 S.Ct. 1778, 32 L.Ed.2d 1113 (1972), and the case was remanded for further consideration. *See* note 6 *supra*.

eliminate the item from the standard of need, *New Jersey Welfare Rights Organization v. Cahill*, 349 F.Supp. 501, 511 (D.N.J. 1972), *aff'd*, 483 F.2d 723 (3d Cir. 1973), the courts will not interfere with the state's pricing of its standard of need. *Houston Welfare Rights Organization, Inc. v. Vowell*, 555 F.2d 1219, 1225–27 (5th Cir. 1977). On the present record, there can be no genuine issue of fact that Illinois did not price its shelter standard so low so as to eliminate it from its standard of need for AFDC recipients.

Accordingly, this court holds that plaintiffs have failed to present any relevant evidence which would even suggest that the shelter standard of need prior to consolidation in 1973 was to pay the actual cost of shelter to AFDC recipients.[8] In fact, the existence of such a massive "rent gap" itself indicates that it was never the intention of the IDPA to allow welfare recipients the right to determine their own shelter benefit level. Summary judgment on this issue is therefore entered on behalf of defendants, there being no genuine issue of

material fact,[9] since they have properly consolidated the prior shelter need standard into the 1973 CSP.[10]

B.

Plaintiffs' next claim of illegality in the 1973 CSP also concerns the manner in which the shelter item of need was consolidated. Plaintiffs point out that under the prior, individualized system, IDPA "prorated" the budgeted shelter need for an AFDC assistance unit whenever a nonrecipient resided with the recipient assistance unit and, if the nonrecipient was a relative of the recipient, IDPA budgeted no rent for the recipient assistance unit ("zero rent" cases). In other words, IDPA conclusively presumed that the nonrecipient nonrelative who was living with the AFDC recipient assistance unit contributed a share of the rent and that the nonrecipient relative paid the entire rent for the AFDC recipients.[11] These conclusive presumptions were embodied in IDPA Categorical Assistance Manual §§ 1504, 1008.6, which provided:

---

**8.** Thus, although plaintiff's present evidence to suggest that in 1973 there was some desire on the part of the administrators of the welfare system to determine if the shelter maximum of $97 should be increased, there is no evidence to suggest that the administrators of AFDC believed that the shelter standard of need was actual cost to recipients. *See Roberge v. Philbrook*, 518 F.2d 162 (2d Cir. 1975).

**9.** In the January 11, 1977 order in this case on the parties' crossmotions for summary judgment, this court stated that there was a genuine issue of fact as to "the nature and extent of what plaintiff refers to as the 'rent gap,' especially whether the maximum levels for rent paid by the defendants represented the actual need of the recipients." In finding that summary judgment on the rent gap issue is now appropriate on behalf of defendants, this court has concluded that the issue of fact it perceived in the January 11, 1977 order is not in fact material to the present crossmotions for summary judgment. Thus, in the January 11, 1977 order, this court believed that there was an issue of fact as to whether Illinois was properly providing "a livelihood compatible with health and well-being" for AFDC recipients in terms of shelter. In other words, this court was questioning whether the shelter exception provision was being properly administered by the state. However, while this issue is relevant, and in fact is the key issue, in *Metcalf v. Swank*, 293

F.Supp. 268 (N.D.Ill.1968), this issue of fact is not material to whether the manner in which the CSP was instituted complied with the *Rosado* mandate. Of course, this court suggests no opinion as to the merits of the *Metcalf* litigation.

**10.** On page 27 of its initial memorandum, plaintiffs also make a passing argument that seems to suggest the IDPA improperly differentiated between areas in the state as to the amount of the shelter needed for AFDC recipients in those areas. Although it appears that *Boddie v. Wyman*, 434 F.2d 1207 (2d Cir. 1970), *aff'd*, 402 U.S. 991, 91 S.Ct. 2168, 29 L.Ed.2d 157 (1971) requires such differences to be based on objective standards, neither party presents evidence concerning the nature, of the shelter need differentials and summary judgment is accordingly inappropriate on this issue.

**11.** Thus, if an AFDC recipient family of two lived in a $90 apartment with a nonrecipient nonrelative, the AFDC recipient family was budgeted for $60 of rent need since it was presumed that the nonrecipient provided a share of the rent equal to one-third, or $30. If the nonrecipient was a relative, IDPA budgeted $0 for the AFDC recipient since it was presumed that the relative, even though not legally obligated to do so, would pay all the rent.

1504. Shared Expenses for Shelter and Utilities.

When shelter and utilities are shared among members of a family group and allowances for these items are budgeted for the recipient, the total cost allowable within rent standards is prorated equally among the number of persons in the household.

1008.6. An allowance to enable the recipient to pay his [prorated] share of the total rent to a relative with whom he is living requires supervisory approval related to an evaluation of the total social and economic factors.

*Id.* Plaintiffs point out that prorating occurred in a substantial number of AFDC families headed by an adult AFDC recipient, as well as in all "no-adult" families, by definition.[12] Moreover, "zero rent" cases, where the nonrecipient was a relative, occurred in 5 percent of all "adult" cases and in 50 percent of all "no-adult" AFDC cases.

Citing the recent Supreme Court decision in *Van Lare v. Hurley,* 421 U.S. 338, 95 S.Ct. 1741, 44 L.Ed.2d 208 (1975), plaintiffs argue that the pre-1973 IDPA policy of *conclusively presuming* that nonrecipients shared shelter expenses with recipients was in violation of the Social Security Act, 42 U.S.C. § 606(a), and a regulation promulgated thereunder. 45 C.F.R. § 233.90(a) (1974). In *Van Lare,* the Supreme Court held that a New York regulation concerning the proration of shelter expenses between recipients and nonrecipients of AFDC benefits who shared common shelter was invalid since the proration was "based on the assumption that the nonpaying lodger is contributing to the welfare household, *without inquiry into whether he in fact does so.*" 421 U.S. at 346, 95 S.Ct. at 1747. Accordingly, plaintiffs contend that in establishing the CSP, IDPA continued to perpetrate the illegal presumption by only including into the CSP the "budgeted" shelter needs, and that the consolidated "standard" should be recomputed to reflect that the "budgeted" shelter needs under the prior, individualized system were illegally reduced. Moreover, plaintiffs contend that defendants are now creating an illegal "double deduction" by reducing the AFDC grant under the CSP by any shelter needs a nonrecipient is presently in fact providing to an AFDC recipient even though IDPA admittedly incorporated this shelter contribution previously into the CSP. Plaintiffs seek an immediate injunction to halt this "double deduction" pending IDPA's recalculation of the consolidated standard of need.

In response, defendants make several arguments. First, although recognizing that *Van Lare* does invalidate their prior policy of conclusively presuming that nonrecipients shared shelter expenses with AFDC recipients, defendants argue that the *Van Lare* decision should not be held "retroactive," and they should not be forced to recompute their consolidated standard of need established in 1973, almost two years before *Van Lare* was decided. Second, defendants argue that plaintiffs are incorrect as to the magnitude of the prior illegality since in many of the cases cited by plaintiffs the nonrecipients were *in fact* sharing rent expenses with the AFDC recipients and the prior illegal "presumption" was an accurate depiction of the "shelter needs" for many of the AFDC recipients. For example, defendants argue that in many cases, the number of which is indeterminable, where "zero" shelter need was budgeted for AFDC recipients because the recipient lived with a nonrecipient relative, the nonrecipient relative was in fact providing the shelter needs for the recipient and the recipient never requested a shelter allowance. Thus, it is argued, it would be unfair to Illinois to force it to recompute its consolidated standard of need because of its prior illegal policy when in fact the policy in a large number of cases probably reflected the actual standard of need for the AFDC recipients under the preconsolidation system. Moreover, defendants argue that because through errors IDPA did not reduce the budgeted need of recipients prior to 1973 in all cases where they lived with nonrecipients, and because of the 12 percent

12. *See* note 3 *supra.*

additional expenditures provided in the CSP above what federal law required, the consolidation plan more than covered any prior illegality due to presumed shelter prorations and therefore a recomputation is needless and wasteful.

Finally, defendants argue that no "double deductions" are taking place presently since defendants are not deducting any shared shelter expense provided in fact by nonrecipients from the CSP grant to an AFDC assistance unit, but rather IDPA is only deducting "income" earned by the AFDC families in "renting" their dwellings to a roomer or boarder or for income received "in kind." Accordingly, since these present policies also existed pre-1973 along with the shelter proration policy defendants contend no injunction is necessary to prevent "double deducting."

■ Initially, this court can not agree with the defendants concerning their "non-retroactivity" argument. As stated previously, states may not employ the device of consolidation of their AFDC program to mask a prior violation of law which thereupon is perpetuated in the new consolidation standard. This is the holding of *Johnson v. White*, 528 F.2d 1228, 1237 (2d Cir. 1975), and *Roselli v. Affleck*, 373 F.Supp. 36 (D.R.I.1974), aff'd, 508 F.2d 1277 (1st Cir. 1974), a holding with which this court agrees. Thus, in *Johnson*, a case similar to the case at bar on the issue of presumed shelter prorations, 528 F.2d at 1236, the Second Circuit stated:

. . . Connecticut cannot properly include in the base for [its consolidation plan] shelter allowances sums that were determined under an unlawful attribution of income policy as delineated in *Van Lare v. Hurley* . . . . While § 402(a)(23) does not require revision of

previously lawful plans to achieve a closer approach to perfection, it likewise does not permit continuation of an unlawful scheme simply because it was updated. See *Roselli v. Affleck, supra*, 508 F.2d at 1282.

*Id.* at 1236–37. Accordingly, this court must agree with plaintiffs that the consolidation of the prorated shelter needs of the prior AFDC recipients based on a conclusive presumption of contribution was and is illegal. *See also Hoehle v. Likins*, 405 F.Supp. 1167 (D.C.Minn.1975), *modified*, 538 F.2d 229 (8th Cir. 1976).

■ However, the issue of whether a recomputation of the standard of need in the CSP is necessary at this time is not so easily resolved. Thus, plaintiffs challenge the second argument raised on this issue by defendants. Relying on *Shea v. Vialpando*, 416 U.S. 251, 94 S.Ct. 1746, 40 L.Ed.2d 120 (1974), plaintiffs contend that defendants *cannot argue* that the illegal presumption *in fact* represented the shelter needs of many of the individual AFDC recipients prior to the 1973 CSP and that therefore a recomputation of the consolidated standard is unnecessary since the state was properly defining the preconsolidation standard of need. Plaintiffs urge that under the decision in *Shea*, and pursuant to 42 U.S.C. § 602(a)(7),[13] the shared expenses for shelter actually provided by the nonrecipients to AFDC recipients prior to consolidation should be considered "income" to the AFDC recipients and that such "income" cannot be incorporated into the CSP and averaged into the consolidated standard of need, but rather must be deducted from the consolidated standard *grant* in each individual case where such income in fact exists.

Plaintiffs' argument can best be understood by example. Assume that prior to

13. Section 402(a)(7) of the Social Security Act provides:

A State plan for aid and services to needy families with children must . . . (7) except as may be otherwise provided in clause (8), provided that the state agency shall, in determining need, take into consideration any other income and resources of any child or relative claiming aid to families with dependent children, or of any other individual (living in the same home as such child and relative) whose needs the State determines should be considered in determining the need of the child or relative claiming such aid, as well as any expenses reasonably attributable to the earning of any such income.

42 U.S.C. § 602(a)(7).

consolidation the entire caseload for the Illinois AFDC program consisted of family A and family B, and that shelter was the only item in the state's standard of need, priced at what the family needed to subsist and not actual cost. Assume further that family A had its standard of need for shelter budgeted at $100 and family B's standard of need budgeted at $200. It is clear that under *Rosado* the state could institute a consolidation and could declare the consolidated standard of need to be $150, the average need for all the families in its caseload. *Rosado v. Wyman, supra*, 397 U.S. at 419, 90 S.Ct. 1207.[14] However, assume further that prior to consolidation, family B actually received $50 in *income* and had its preconsolidation *grant* reduced to $150. What plaintiffs argue is that if the state then attempted to consolidate on the basis of its prior "budget," and thereupon obtained a "standard of need" after consolidation of $125,[15] the state would have violated *Rosado's* "fair averaging" requirement which prohibits the averaging of "income" of one family over the entire AFDC caseload in a consolidation. *Shea v. Vialpando, supra*, 416 U.S. at 260–61, 94 S.Ct. 1746. Plaintiffs argue that the state must establish its consolidated standard of need at $150 and thereupon *budget* $150 to family A and $100 to family B since family B would have its $50 income deducted from its grant. Accordingly, in the case at bar, plaintiffs contend that even if the defendants could show that in some cases prior to consolidation the nonrecipient sharing a residence with a recipient *was in fact* contributing or providing shelter expenses for the recipient, such expenses are "income" to the AFDC recipient which cannot be averaged into the consolidated plan to reduce the standard of need after consolidation.

Defendants, in response to plaintiffs' challenge to their argument that no recomputation is needed, contend that plaintiffs have misconstrued the manner in which IDPA's proration policy operated. Another example is required to understand defendants' argument. Assume that the previously mentioned families A and B each have four members but that family B shares an apartment with a non-AFDC recipient. Assume that family A lives in an apartment which rents for $100 and family B lives in an apartment which rents for $200 and that each apartment is subsistence level in quality so that the state budgeted $100 for family A's shelter need and would budget $200 for family B's shelter need if family B did not have a nonrecipient living with it. Assume further that the nonrecipient living in the apartment with family B contributes *in fact* $40 towards the $200 rent for the apartment. It is defendants' contention that this contribution to rent by the nonrecipient living with family B is not "income" to family B, but rather that family B's "need" is reduced to $160. Accordingly, if a consolidation takes place, the consolidated standard of need would be $130 ([$100 + $160] ÷ 2) and not $150 since family B only "needs" $160 for shelter. Such a consolidation would be as valid, defendants argue, as a consolidation where family B lived by itself and rented a $160 apartment with $160 being its standard and preconsolidated budgeted need. Therefore, according to defendants, IDPA should be allowed to show that prior to consolidation the nonrecipients living with AFDC recipients did in fact lower the recipients' "standard of need" and any illegal presumption was minimal in distorting the preconsolidation standard of need so that no recomputation is necessary.

Initially it should be noted that the parties are in fact "talking past" each other. Thus, defendants do not challenge plaintiffs' contention that pursuant to 42 U.S.C. § 602(a)(7) and the decision in *Shea* a state may not average the income of one AFDC

---

14. "We do not, of course, hold that New York may not, consistent with federal statutes, consolidate items on the basis of statistical averages. Obviously, such averaging may affect some families adversely and benefit others." *Rosado v. Wyman*, 397 U.S. 397, 419, 90 S.Ct. 1207, 1221, 25 L.Ed.2d 442 (1970).

15. This figure of $125/family is determined by adding the $100 budget for family A and $150 budget for family B and dividing by the number of families, *i. e.*, two.

recipient over the entire AFDC caseload in the process of consolidating. Such an averaging of "income" would be an unfair averaging in violation of *Rosado* as well since it would confuse income with need. And, plaintiffs do not challenge defendants' contention that a state has broad discretion in determining its standard of need and may therefore view shared shelter payments by a nonrecipient as reducing the standard of need when such payments are in fact made. *Houston Welfare Rights Organization Inc. v. Vowell*, 555 F.2d 1219, 1224–25 (5th Cir. 1977).[16] Accordingly, the real issue between the parties is what *in fact* was the policy in Illinois prior to consolidation concerning how shared expenses were viewed by IDPA.

After reviewing the record as it is presently before the court on these crossmotions for summary judgment, this court must again conclude that there is a genuine issue of material fact concerning how IDPA treated shared shelter expenses prior to the 1973 CSP. Thus, although plaintiffs suggest that defendants have admitted that the proration policy was an "income" determination, defendants vehemently reject this notion arguing that the nonrecipient's contribution to shelter expenses reduced the AFDC recipient's need. Since a decision on this issue is of great importance, this court is of the opinion that a complete record demonstrating how the IDPA proration policy was operated is needed. Summary judgment on this issue is therefore denied at this time and this court does not decide if a recomputation of the CSP is needed because of IDPA's preconsolidation proration policy.[17]

**16.** In *Vowell*, the district court incorrectly held, prior to *Van Lare*, that a state could presume that shared shelter payments by a nonrecipient living with a AFDC assistance unit reduced the preconsolidated standard of need of AFDC recipients for shelter. The court of appeals properly reversed that decision but stated that a shelter proration policy which in fact reflected the "needs" of AFDC recipients was valid under *Rosado*. 555 F.2d at 1224.

**17.** It should be pointed out that even if defendants prevail on the fact issue mentioned in the text, it will still be defendants' burden to show

■ Finally, as to the "double deduction" issue, the parties are not in dispute. Thus, defendants admit that they cannot reduce an AFDC recipient's grant under the consolidated plan by any shared shelter expenses a nonrecipient presently is contributing to an AFDC recipient because such contributions were already averaged into the CSP. Defendants argue that they are not double deducting since they now are only deducting from the CSP grant if the AFDC recipient has a roomer or boarder paying rent or receives income in kind. Plaintiffs admit that if this is in fact IDPA's policy there is no double deduction but argue that IDPA is not implementing the policy. Defendant IDPA has agreed, however, to promulgate a revision of its policy so as to "clarify" the law on these deductions.

Accordingly, defendants are hereby ordered to promulgate and implement the proposed clarification of their income deduction policy and should verify that in all cases where income is deducted under the new policies double counting is not occurring.

### C.

■ Plaintiffs contend that the IDPA improperly consolidated the standard of need for AFDC benefits in that IDPA failed to adjust all the prior items of need under the individualized program for cost-of-living increases up to the date of consolidation. As it was stipulated to, defendants adjusted all the prices for the individual items of need to 1969 levels prior to consolidation. This failure to update plaintiffs

that there were a sufficient number of actual cases where the illegal presumption of shelter contribution matched the in fact contribution of the nonrecipient making a recomputation of the CSP standard of need unnecessary. Thus, if as defendants suggest it is impossible to determine the number of cases in which the presumption equalled the fact, it was defendants' illegal policy which caused the "impossibility" and defendants should bear the burden of recomputing the consolidated standard and should not be allowed to use their illegal policy as a *de facto* defense.

contend, as required by federal and state law, violated the mandate of *Rosado* and obscured Illinois' standard of need.

Although this court must agree with defendants that federal law pursuant to 42 U.S.C. § 602(a)(23), as interpreted by *Rosado*, alone does not mandate that a state update for inflation the items in its standard of need after 1969, *see, e. g., New Jersey Welfare Rights Organization v. Cahill*, 483 F.2d 723 (3d Cir. 1973),[18] this court again believes that summary judgment can not be had for either party on this question. Thus, this court agrees with the decision by the First Circuit in *Roselli v. Affleck*, 508 F.2d 1277, 1282 (1st Cir. 1974), that if the state had imposed an update for inflation requirement on itself under state law prior to consolidation, the state would be required to update its prior standard of need to the cost-of-living level immediately before consolidation.

In the case at bar, the parties are again in dispute as to what Illinois policy was concerning the updating of its standard of need for inflation prior to 1973. Plaintiffs merely cite Ill.Rev.Stat. ch. 23, §§ 12–4.11, 12–4.15 which provide that:

> § 12–4.11 . . . . The items in the standards shall be priced periodically for changes in cost, as provided in Section 12–4.15
>
> § 12–4.15 . . . . . [The IDPA must] [m]ake periodic surveys of cost of living factors in relation to the needs of recipients of public aid . . . .

in support of its position,[19] and defendants merely respond that no case has held[20] that these provisions mandate cost of living increases for the preconsolidated standard of need. Neither party has attempted to

present facts concerning the manner in which the Illinois preconsolidated program operated *in fact* in relation to the inflation factor. Accordingly, summary judgment is again inappropriate at this time.

### D.

Next, plaintiffs seem to argue that defendants have somehow improperly failed to adjust certain items in the prior standard of need up to 1969 prices as defendants admit they were required to do. However, since plaintiffs in their reply brief indicated that this argument is premised on a favorable resolution of the argument raised in section III. C. of this opinion, summary judgment is inappropriate on this issue as well.

### E.

The fifth argument raised by plaintiffs concerns the manner in which certain security deposits paid to or on behalf of AFDC recipients to obtain shelter were incorporated into the CSP. As pointed out by plaintiffs, Ill.Rev.Stat. ch. 23, § 12–4.11 provided that the IDPA was to make available security deposits to AFDC recipients whenever such deposits were *necessary* to obtain shelter for the AFDC recipients. *See Figures v. Swank*, 128 Ill.App.2d 211, 263 N.E.2d 599 (1970). It has been stipulated that under the provisions of section 12–4.11:

> IDPA maintained a program under which it would issue a letter or other document to all AFDC recipients' landlords in lieu of a security deposit, guaranteeing payment of the final month's rent, up to the amount of the recipient's budgeted need for rent. IDPA would then pay cash to the landlord upon a recipient's default in meeting rental obligations.

18. Plaintiffs have not cited to this court, and this court has not found in its own research, any case which has held under any federal statute that states must adjust their standards of need for inflation. The provisions of federal law other than 42 U.S.C. § 602(a)(23), which plaintiffs cite, such as 45 C.F.R. 233.20(a)(1), merely mandate "fair pricing" and as this court has stated, "fair pricing" merely prohibits a completely arbitrary assignment of a price to an item. *See New Jersey Welfare Rights Or-*

*ganization v. Cahill*, 349 F.Supp. 501, 511 (D.N.J.1972), *aff'd*, 483 F.2d 723 (3d Cir. 1973).

19. The other provisions cited by plaintiffs Ill. Rev.Stat. ch. 23, §§ 1–1, 4–11, make no reference to a requirement of updating for inflation. *See* note 18 *supra*.

20. Defendants, however, have not presented the Illinois cases they state hold that an updating for inflation is not required.

In its consolidation process, IDPA included the amount of money paid to landlords to meet security deposit demands or to fulfill security deposit guarantees. No monetary value was computed or included for security deposit guarantees for which money was not expended.

Plaintiffs contend that IDPA has obscured the standard of need since IDPA should have included in the consolidation the total face value of all rent guarantees issued by IDPA and not merely the amount IDPA had to pay on its guarantees. Accordingly, plaintiffs argue that an item of need has been effectively excluded in the consolidation process in direct violation of *Rosado.*

On this issue this court agrees that summary judgment is appropriate on plaintiffs' behalf. Defendants' one page response to plaintiffs' argument is clearly inadequate. First, defendants argue that section 12–4.11 did not require that a security deposit *be paid* to each recipient's landlord. Although this may be a valid interpretation of *Figures* and defendants under section 12–4.11 could have provided a guarantee for the security deposit to landlords who would take one, this argument does not address the fact that the *guarantees* were required under section 12–4.11 and were not valued and included in the consolidation.

Second, defendants argue that the guarantees issued by IDPA, as distinguished from the expenditures were not part of the standard of need for AFDC recipients prior to consolidation. This argument is premised on 42 U.S.C. § 606(b) of the Social Security Act which provides that the AFDC program is to consist of "money payments." This argument, however, is without merit. Thus, the preconsolidation IDPA manual for AFDC benefits expressly provides that security deposit rent guarantees were part of IDPA's standard of need. IDPA Categorical Assistance Manual § 1008–4.1. Moreover, defendants do not suggest in any way how the expenditures for security deposits could be part of the pre-1973 standard of need for the AFDC program but the guarantees themselves were not.

Accordingly, plaintiffs' motion for summary judgment on this issue is granted there being no genuine issue of material fact. Since the security deposit guarantees were part of the preconsolidation standard of need for AFDC recipients, and since this item should have been paid in money under 42 U.S.C. § 606(b), *see X v. McCorkle,* 333 F.Supp. 1109 (D.N.J.1970), *aff'd sub nom., Engelman v. Amos,* 404 U.S. 23, 92 S.Ct. 181, 30 L.Ed.2d 143 (1971) (per curiam), defendants are hereby ordered to reconsolidate the CSP to reflect the value of the guarantees to the AFDC recipients.[21]

### F.

Plaintiffs' final argument concerns IDPA's consolidation of maximum payments rather than actual need for certain other items in the preconsolidation standard of need. This argument is based on the argument raised in section III. A. of this opinion and accordingly summary judgment is entered on behalf of defendants on this issue.

### IV. Conclusion

In summary, defendants' motion for summary judgment on the issues raised in sections III. A. and III. F. of this opinion are hereby granted and defendants are not required to recalculate the CSP because they averaged in the maximums for itemized needs existing prior to consolidation. Summary judgment is entered on behalf of plaintiffs on the issue raised in section III. E. of this opinion and defendants are hereby ordered to reconsolidate the CSP to reflect the value of security deposit guarantees issued prior to consolidation in the base year. Moreover, summary judgment is entered on behalf of plaintiffs on the issue of the "double deductions" discussed in section III. B. of this opinion and defendants are ordered to promulgate and implement the clarification of their policy concerning deductions from AFDC flat grants based on

---

**21.** Of course, since the issue has not been properly raised or addressed by the parties, this court does not decide how and at what price the guarantees should be valued.

the recipient's income. In all other respects the parties' crossmotions for summary judgment are denied. The parties are hereby requested to submit a draft order incorporating this opinion within ten (14) days.

It is so ordered.